UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

97 JAN 30 PM 2:59
U.S. DISTRICT COURT
N.D. OF ALABAMA

VERONICA G. BROWN, et al,  )
                           )
    Plaintiffs,            )
                           )
    vs.                    )    CV 95-PT-3090-S
                           )
UNITED STATES OF AMERICA,  )
                           )
    Defendant.             )

**ENTERED**

**JAN 3 0 1997**

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

This cause came on to be heard at a bench trial.

#### Facts

Prior to July 1990, plaintiff Veronica G. Brown (plaintiff) had been in Germany with her husband, Army Sergeant George Brown.[1] Brown's U.S. Army superiors in Germany were on notice that Sgt. Brown had been abusive toward plaintiff. During a meeting with the Browns on about June 11, 1990, Sgt. Brown's superior officer ordered him confined and directed that he not contact the plaintiff. On or sometime after June 11, Sgt. Brown acted violently toward both plaintiff and his superior officer

---

[1] The Browns had been married 6 1/2 years.

1

during a meeting.[2] Plaintiff told the superior officer that Sgt. Brown had threatened to kill her if she returned to Birmingham, Alabama.[3] Plaintiff last saw Sgt. Brown on July 5, 1990.[4] On July 8, 1990, she was escorted by Army personnel to a plane in Germany and she returned to Birmingham where her parents lived, on the same day.

At some point, Sgt. Brown went AWOL.[5] On July 10, 1990, plaintiff learned that Sgt. Brown was in Birmingham. At some point, she called an office at Ft. McClellan, Alabama and asked someone (see Davis, infra) if they had a "warrant" for Sgt. Brown's arrest for AWOL. The term "warrant" may or may not be an appropriate one. In any event, she was inquiring as to whether Ft. McClellan officials had received appropriate notice from Army officials in Germany with regard to Sgt. Brown's AWOL status. If

---

[2]The court does not have a transcript of the trial. It has only referred to its own notes. The exact dates during June and July 1990 in Germany are not significant.

[3]The Browns had difficulties throughout their marriage and separated several times.

[4]Apparently, he attacked her on that occasion. That may be the same occasion on which he attacked his superior officer.

[5]It is not clear whether he was considered to be in this status before or after July 8, 1990. It is not significant. He was AWOL at least by July 10, 1990. As the court recalls the evidence, he went AWOL before July 8, 1990 and the Army was already looking for him in Germany on July 8, 1990.

2

Sgt. Brown were in Birmingham, Ft. McClellan would be the nearest Army base charged with the responsibility, after notice, of having him picked up. Plaintiff testified that she told someone at Ft. McClellan where Sgt. Brown likely was in the Birmingham area. Plaintiff also testified that someone at Ft. McClellan told her to "stay put" and if and when Sgt. Brown was taken into custody, she would be notified. Plaintiff also called the Birmingham Police Department on July 12, 1990 and alerted that Department of the danger to her of Sgt. Brown being in the area.

Apparently, at some point, someone at Ft. McClellan told plaintiff that Ft. McClellan officials couldn't do anything without a "warrant" or whatever the appropriate authority was. Plaintiff testified that she repeatedly called Ft. McClellan, including two times after she talked to the Birmingham Police Department. She testified that she was told to "stay put."[6]

On Saturday, July 14, 1990, at about 7:10 a.m., Sgt. Brown came to plaintiff's parents' home, where plaintiff was located, and he shot <u>at her</u> four times. He shot plaintiff's oldest daughter's father (plaintiff's ex-husband) who was visiting at the parents' home. Neither plaintiff nor her parents were

---

[6]Plaintiff testified that she told someone at Ft. McClellan that Sgt. Brown had threatened to kill her.

3

wounded. The shootings took place at approximately 9:00 - 9:20 p.m. on Saturday, July 14, 1990. The Birmingham Police came to the scene and located the ex-husband where he had run about two blocks away.

It is apparent that, at this point, both the plaintiff and plaintiff's parents and the Birmingham Police Department knew that Sgt. Brown was in Birmingham, that he knew where plaintiff was located and that he was violent and dangerous. They also knew that the Army had not undertaken to protect either plaintiff or her parents from Sgt. Brown. They further knew that the advice to "stay put," if it had indeed been given, was no longer appropriate advice unless the Birmingham Police or someone else stayed to protect plaintiff and her parents. The Birmingham Police Department did not provide such protection. It is frivolous to suggest that, at this time, plaintiff or her parents should have thought that merely remaining at home afforded protection to them.

On Sunday, July 15, 1990, at about 7:10 a.m., Sgt. Brown returned to the same location. Plaintiff's mother tried to stop him on the outside. Plaintiff's father also went outside. Plaintiff heard four shots while she was calling the police. Sgt. Brown shot and wounded plaintiff and killed both her

4

parents.

There is no evidence that plaintiff ever asked any Army personnel at Ft. McClellan for security advice nor that any Army personnel indicated to her that Army personnel would protect her, at home or anywhere else.[7]  She never requested, in this country, shelter or protection.  She only inquired about a "warrant" at which time she was allegedly told, "stay put and we'll let you know."  Plaintiff testified that the Birmingham Police told her they would patrol at her residence on the night of the 14th.  There is no evidence that she described Sgt. Brown to the police nor that, in fact, the police did patrol the area.

Plaintiff never asked to be placed by the Army in a "safe house," although she knew that such a service was available.  She didn't ask the Birmingham Police what she should do after the incident on the 14th.  She testified that she felt "safe" at her parents' home.

Plaintiff offered an "expert" witness.  While this witness may have some knowledge as to criminal justice in general, he had

---

[7]In her deposition, plaintiff stated that she was just told "To stay where I was and when the warrant was faxed, they would call me." She was then asked, "Were you given any instruction about what to do if your husband got up with you, if you met or saw your husband?"  She answered, "No, sir."

5

no particularized knowledge relating to any obligation or duty of the Army.

Glenn Davis testified. He acknowledged receipt of plaintiff's phone calls. He was a civilian who dealt with apprehending AWOL's. Davis treated the incident as a regular AWOL incident. His role was to confirm that Sgt. Brown was still AWOL and to request that he be taken into custody by civilian authorities.

While Davis did not recall specifically what was said to plaintiff during any conversations with her, he testified that his limited role was to pass on pickup orders to civilian police and that, usually, neither he nor any military authorities were involved in the initial arrests. He testified that it was not his custom or practice to advise people on security concerns. The court cannot find any reasonable inference that Davis gave security advice. Even if he said "stay put," it would only have involved his being able to report to plaintiff if and when Sgt. Brown was taken into custody.

### Conclusions of Law

Plaintiff cites <u>Dailey v. City of Birmingham</u>, 378 So.2d 728 (Ala. 1979) for the proposition that "Alabama clearly recognizes the doctrine that one who volunteers to act, though under no duty

6

to do so, is thereafter charged with the duty of acting with due care and is liable for negligence in connection therewith." This court accepts this abstract principle of law and further accepts that Alabama law is applicable to this case. The court cannot conclude, however, that the defendant volunteered <u>to protect</u> plaintiff from her husband or that it undertook to give her security advice. Thus, it had no legal duty to protect her. It is even more obvious that it owed no legal duty to her parents.

Even if by some stretch it could be determined that defendant volunteered "to act" in the first instance or to suggest to plaintiff that she remain where she was,[8] that chain of events was certainly broken when her husband came to her house on the 14th and shot at her and her ex-husband, and wounded her ex-husband and the whole incident was investigated by the Birmingham Police. Plaintiff may have thereafter relied on some representation of the Birmingham Police. She could not, however, have thereafter reasonably relied upon defendant's purported

---

[8]There is absolutely no reasonable inference that Davis undertook to protect plaintiff. Further, the court cannot find by a preponderance of the credible evidence that he gave her security advice.

7

advice to "stay put."[9] Even if there were a finding of duty (which the court does not find) and negligence (which the court does not find) there is no proximate cause. Whether styled as contributory negligence[10] or as a lack of proximate cause, the result is the same. The Birmingham Police certainly had more reason to seek out and apprehend Sgt. Brown after attempted murders, of which they were on notice, than did defendant to cause him to be picked up for being AWOL. This court recognizes the principle established in Sheridan v. U.S., ___ U.S. ___, 108 S.Ct. 2449 (1988).[11] This court's decision is based, however, on a finding of no legal duty, no negligence and no proximate cause. In the alternative, the court finds contributory negligence. It should be noted that plaintiff does not claim that the defendant was negligent in allowing Sgt. Brown to go AWOL and return to this country. See 28 U.S.C. §2680(k). To the extent that plaintiff makes a negligent training and supervision claim, it is

---

[9] There is no evidence that Davis had any authority to offer security advice to plaintiff or anyone else. In effect he transmitted AWOL pickup orders to civilian authorities.

[10] See Knight v. Alabama Co., 580 So.2d 576 (Ala. 1991).

[11] The court also notes Gilmore v. Shell Oil Co., 613 So. 2d 1272 (Ala. 1993) and E.H. v. Overlook Mtn. Lodge, 638 So. 2d 781 (Ala. 1994).

8

frivolous.

> The court will enter judgment in favor of the defendant.
>
> This 30 day of January, 1997.

```
                              ROBERT B. PROPST
                       SENIOR UNITED STATES DISTRICT JUDGE
```